*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. ROBINSON, Minor.

UNPUBLISHED
November 21, 2023

No. 365598
Clare Circuit Court
Family Division
LC No. 21-000018-NA

Before: LETICA, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

Respondent-father appeals by right the trial court's order terminating his parental rights to the minor child, AR, pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. FACTUAL BACKGROUND

These child-protective proceedings began in March 2021 when the Department of Health and Human Services (DHHS) filed a petition seeking removal of AR from father's care and jurisdiction over the minor child. DHHS alleged that father was "arrested while at the hospital" when AR was born due to a number of outstanding warrants for drug-related charges. According to the petition, a police officer reported that father's home was a known drug house and that AR would not be safe in his care. The petition also noted that on February 18, 2021, a Children's Protective Services (CPS) worker made an unannounced visit to father's home. During the visit, father admitted that if he were to take a drug screen, he would test positive for methamphetamine. Father refused to take a drug test or engage in substance abuse treatment at that time. Father subsequently tested positive for amphetamines and methamphetamine on February 23, 2021, and March 2, 2021. Father failed to bring AR to the doctor for a scheduled checkup, and a Families First worker expressed concern that father was "co-sleeping with [AR] despite being educated on safe sleep practices." AR was hospitalized on March 8, 2021 for dehydration. At the preliminary hearing on March 10, 2021, DHHS presented evidence that father was living in "a known drug home that was not safe and appropriate for the family." CPS worker Bianca Hernandez testified that she was concerned about father's ability to care for AR, particularly given his failure to take her to her doctor's appointments and her recent hospitalization for dehydration. Among other

allegations, DHHS alleged that father was abusing drugs and improperly supervising AR. Father admitted to several paragraphs contained in the petition and pleaded to jurisdiction. AR was removed from father's care and placed with her maternal grandmother shortly thereafter.

DHHS developed a case service plan after the trial court took jurisdiction of AR, which the trial court adopted. The case service plan required father to complete parenting education, undergo substance abuse and psychological evaluations, participate in the recommended mental health and substance abuse treatments, complete random drug screens, participate in mental health counseling, obtain and maintain safe and stable housing, obtain and maintain a legal source of income, and participate in parenting time. A court report was filed with the court on January 5, 2022, which indicated that father's housing was inadequate; that he had yet "to provide documentation of" his reported employment; that he was dismissed from "services with the Foster Care Supportive Visitation program" for failing to participate; and that he was discharged from substance abuse therapy services for lack of participation. Father failed to show up for all of his random drug screens except one, at which he tested positive for amphetamines and methamphetamine. The report further indicated that father was incarcerated on December 6, 2021, for failing to appear at court in relation to "two charges for possession of controlled substances." The report also indicated that a psychologist attempted to contact father on several occasions to schedule the psychological evaluation, but father never returned any of the calls.

Relying on the court report, counsel for DHHS requested that the court authorize DHHS's request to file a supplemental petition for termination because a significant amount of time had passed and barriers to reunification continued to exist. The court denied the request to file a supplemental petition pending the outcome of a psychological evaluation for father. At a March 2022 combined dispositional review and permanency planning hearing, counsel for DHHS stated that father had shown "minimal progress" and that she did not "know if the court [could] even find that there's been parental progress such that it makes sense to continue offering services to" father.

Another hearing was held in May 2022. At that point, father had been arrested for possession of methamphetamine and was awaiting sentencing for an earlier conviction of possession of methamphetamine from December 2022. According to counsel for DHHS, father had not been able to find housing or employment due to his incarceration, but was participating in virtual parenting time visits. Father failed to attend his psychological evaluation, which had to be rescheduled. The trial court found that father had "made extremely limited progress" and indicated that it would allow DHHS to file a supplemental petition for termination.

At an August 2022 hearing, counsel for DHHS stated that father had recently been "sentenced to twelve months with credit for 167 days" for his two oldest drug possession charges, but he still had a "pending felony . . . for possession of methamphetamine" in relation to his arrest in April 2022. Father indicated that he was working while he was in prison and "using the proceeds of that work to stay in contact with" AR. He further stated that he "signed up for [Alcoholics Anonymous] while he was in prison," and he had been trying to arrange substance abuse services through Community Mental Health (CMH). The lawyer-guardian ad litem (LGAL) stated that AR had been placed with her maternal grandmother "since removal" and that she was "doing really good there," and AR's maternal grandmother reported that she wanted to adopt AR. The LGAL agreed with DHHS's recommendation for termination given father's lack of participation in

services. Counsel for DHHS indicated that DHHS was still working out "the wrinkles" but that it would soon be ready "to move forward on a petition to terminate."

Father completed his psychological evaluation in September 2022, and it was filed with the court in December 2022. The evaluation indicated that father reported that "he was diagnosed with Dyslexia" as a child. As a result of father's disclosure, the psychologist administered all of the psychological tests verbally. Father also stated during the evaluation that he used methamphetamine because it helped him "focus" and "actually complete stuff," and he "spent a good deal of time discussing how his use of methamphetamines did not endanger his child." Father was diagnosed with "Stimulant Use Disorder," "Bipolar I Disorder," and "Opioid Use Disorder, In remission." The psychologist recommended that father be "discharged into a sober living facility upon his release from jail," attend group and individual substance abuse counseling, and "attend a psychiatric evaluation to determine if medication could be a helpful addition to his treatment plan."

The termination hearing in this case was held on March 17, 2023. At the hearing, evidence was presented that father was ordered to participate in and benefit from "[p]arenting education, substance abuse treatment, [and] mental health counseling." Father made little effort to address his substance abuse issues or participate in substance abuse treatment. Father stated that "substance abuse treatment would [not] be helpful to [him] now" because he believed that he could overcome his substance abuse on his own. Father obtained housing and employment upon his release from jail, but continued to experience run-ins with the court system for further drug-related charges, and was thus in and out of jail over the course of the proceedings. Evidence presented at the termination hearing indicated that while he was not incarcerated, father failed to participate in court-ordered parenting classes.

Father testified at the hearing that he "suffer[ed] from dyslexia" and that he read and wrote things "backwards" some of the time, particularly when he became "upset" about something. Father stated that he "[s]ometimes" had "issues understanding what [he] needed to do" because it was "hard to read stuff sometimes and actually have it make sense." When asked whether he let DHHS know that he was struggling to understand things, father stated that he was a "[c]losed off person" and did not want to "bother others with [his] problems[.]" Father admitted that "it would've been helpful if [he] would've told the workers that [he was] having some issues understanding the material[.]" Father's caseworker, Morgan Zenz, testified about the accommodations that she provided to father once she was made aware of his disability:

> *Q*. Are you aware that [father] is dyslexic?
>
> *A*. Yes.
>
> *Q*. Okay. Do you think that would have affected his ability to comply with some of your directives?
>
> *A*. I do not.
>
> *Q*. You don't think that he would have needed any say, supportive services to accommodate his dyslexia?

*A.* When services were being asked of him, they were normally verbally [sic] and written. We went over the [parent-agency treatment plan]s when I would do my monthly visits with him in jail.

*Q.* What did you do to accommodate his dyslexia, if anything?

*A.* Verbally talk to him about the services offered.

Zenz ultimately testified that she believed that termination of father's parental rights was in AR's best interests because AR had "been in care for over two years," father had "not participated in any" of the provided services, and had not "not overcome[e] the barriers that brought [AR] into care." The record further indicated that AR was developing a bond with father, who consistently made efforts to attend parenting time, but that she had a stronger bond with her grandmother and was doing well in her placement with her grandmother. The evidence also indicated that AR's grandmother remained willing to adopt AR. At the close of the hearing, the trial court terminated father's parental rights after it found that DHHS had made reasonable efforts to reunify the family, that statutory grounds for termination pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j) were established,[1] and that termination of father's parental rights was in AR's best interests. This appeal followed.

## II. ANALYSIS

### A. REASONABLE EFFORTS

Father first argues that the trial court erred by finding that DHHS made reasonable efforts to reunite him with AR prior to seeking termination. Father suffers from dyslexia, and asserts that DHHS had an obligation under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, to ensure that he was not excluded from the benefit of services offered by DHHS. He further argues that DHHS failed to accommodate his intellectual disability. We disagree.

This Court reviews "for clear error a trial court's decision regarding reasonable efforts." *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021). The trial court's finding is clearly erroneous if a review of the entire record leaves this Court with a definite and firm conviction that

---

[1] We note that the trial court erroneously relied upon the pre-amendment version of MCL 712A.19b(3)(g), which was amended effective June 12, 2018. See 2018 PA 58. DHHS bears some responsibility for the error, as in its petition, it relied upon the pre-amendment version of the statute. In the event that DHHS has not already updated the verbiage in its termination petitions to reflect the current statutory language, we encourage it to do so. However, father does not raise this issue or challenge the statutory grounds for termination on appeal. Regardless, the trial court also found that statutory grounds under MCL 712A.19b(3)(c)(*i*) and (3)(j) had been proven by clear and convincing evidence. Only one statutory ground need be proven for termination. See *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011) ("Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds.").

a mistake was made. *In re McCarrick/Lamoreaux*, 307 Mich App 436, 463; 861 NW2d 303 (2014).

Absent certain aggravating circumstances, "[r]easonable efforts to reunify the child and family must be made in all cases . . . ." MCL 712A.19a(2). See also *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005) ("In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal . . . ."). As part of its reasonable efforts, DHHS "must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks/Brown*, 500 Mich 79, 85-86; 893 NW2d 637 (2017). See also MCL 712A.18f(3)(b) and (c). DHHS and the trial court must then continually ensure that a parent has "a *meaningful* opportunity to comply with a case service plan." *In re Mason*, 486 Mich 142, 169; 782 NW2d 747 (2010) (emphasis added). Additionally, "[n]ot only must [a] respondent cooperate and participate in the services, [he or] she must benefit from them." *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).

The ADA provides that " 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *Hicks/Brown*, 500 Mich at 86, quoting 42 USC 12132. While the ADA does not provide a defense to proceedings to terminate parental rights, *In re Terry*, 240 Mich App 14, 24-25; 610 NW2d 563 (2000), it does require DHHS to provide reasonable accommodations to a disabled parent when providing services to achieve reunification and avoid termination, *Hicks/Brown*, 500 Mich at 86, citing 42 USC 12132 and 28 CFR 35.130(b)(7). The burden is on the parent to identify other "services that would have been appropriate in light of such disability or how the services that were offered were deficient" and to establish "that he or she would have fared better if [those] other services had been offered." *Sanborn*, 337 Mich App at 266-267. "Absent reasonable modifications, 'efforts at reunification cannot be reasonable . . . if the [DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA.' " *Id*. at 264, quoting *Hicks/Brown*, 500 Mich at 86 (alteration in original). "[T]ermination is improper without a finding of reasonable efforts." *Hicks/Brown*, 500 Mich at 90. See also MCL 712A.18f(4).

However, DHHS "cannot accommodate a disability of which it is unaware," and it must have knowledge that a parent is disabled before is required to provide reasonable accommodations for the purposes of the ADA. *Hicks/Brown*, 500 Mich at 87. Father first indicated that he suffers from dyslexia during his psychological evaluation in September 2022. The evaluation was filed with the court in December 2022. Prior to that, he failed to inform the court or DHHS that he has dyslexia or indicate that his dyslexia required accommodations. Father could have indicated such over the two years in which he participated in this case, but chose not to do so. Regardless, however, the record reflects that DHHS provided father with reasonable accommodations for his learning disorder once it became aware of his condition. The psychological evaluation indicated that as soon as father reported that he was dyslexic, the psychologist administered all of the psychological tests verbally so that father could complete them. At the termination hearing, a caseworker testified that she was eventually made aware of father's dyslexia, so she ensured that information regarding services was provided to him both in writing and verbally. The caseworker further testified that she verbally spoke to father about all of the offered services and verbally reviewed the case service plan with him at least once per month. The caseworker stated that father

had never indicated "that he didn't understand what's being requested of him to do" or "that he needed a better description of what services [DHHS was] asking him to participate in." During his testimony at the termination hearing, father admitted that he understood that a case service plan was established, that the primary focus of the plan was to address his substance abuse and mental health issues, and that he "had to comply with the case service plan in order to regain custody" of AR. DHHS's efforts toward reunification are unreasonable if it "has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Hicks/Brown*, 500 Mich at 86. It is clear from the record that DHHS modified its procedures to accommodate father's dyslexia when it became aware of the problem.

Accordingly, we conclude that father has failed to show that DHHS failed to accommodate his disability. Beyond that, the record is replete with evidence that DHHS provided father a multitude of services to address his primary barriers to reunification, including substance abuse and mental health. Despite several referrals to substance abuse services, father refused to participate in them. Father did not complete most of his mandatory drug screens for the first three reporting periods, and the three screens that were completed were positive for amphetamines, methamphetamine, tetrahydrocannabinol (THC),[2] or a combination of the three. Father could not participate in random drug screens for a substantial period of time because he was incarcerated for drug-related charges. Father consistently completed his drug screens after he was released from incarceration, but he continued to test positive for THC, and he admitted at the termination hearing that he smoked unprescribed marijuana immediately after he woke up every morning. Father testified that he attended Narcotics Anonymous (NA) while he was incarcerated but that he did not believe that he benefited from it. While father attended some group counseling in jail, he testified that he did not benefit from it. Father admitted that, despite his 20-year battle with substance abuse, he did not participate in any of the recommended mental health services throughout the case and still was not participating in any substance abuse treatment or mental health counseling at the time of the termination hearing. He reasoned that such services would not benefit him. That father did not participate in or minimally participated in the provided services and failed to benefit from those services does not detract from the reasonable efforts made by DHHS. See *In re TK*, 306 Mich App at 711.

## B. BEST INTERESTS

Father also argues that the trial court clearly erred by finding that the termination of his parental rights was in AR's best interest. We disagree.

---

[2] THC is the primary psychoactive substance in marijuana. Marijuana is now legal for recreational use in Michigan under the Michigan Regulation and Taxation of Marihuana Act (MRTMA), MCL 333.27951 *et seq*. However, even though marijuana has been legalized, if a parent's use of marijuana creates an unreasonable danger to a minor "that can be clearly articulated and substantiated," the person can be "denied custody of or visitation with a minor." MCL 333.27955(3). Trial courts are generally required to evaluate a parent's marijuana use in the same manner as alcohol or any other legal intoxicant. The relevant inquiry is whether use of the substance will have a negative effect on a parent's ability to parent, or will cause a risk of harm to the child. *In re Richardson*, 329 Mich App 232, 252; 961 NW2d 499 (2019).

"If the court determines that one or more statutory grounds for termination exist and that termination is in the child's best interests, the court must enter an order terminating the respondent's parental rights and order that additional efforts for reunification not be made." *In re Ferranti*, 504 Mich 1, 16; 934 NW2d 610 (2019), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The trial court's ruling regarding best interests is reviewed for clear error. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012).

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). When determining whether termination is in the best interests of the child, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). In making its determination, the court may consider a variety of factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *White*, 303 Mich App at 713-714. "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*.

Father emphasizes that he had a strong bond with AR. All of the parties involved in this case acknowledged that AR had a bond with father. However, the trial court must weigh *all* of the available evidence when making a best-interests determination. *Id*. at 713-714. Father testified that he had been battling substance abuse and addiction for 20 years, and he admitted that he did not participate in any substance abuse services throughout the case beyond NA in jail. He reasoned that he received no benefit from these services. Father also stated that he similarly was not participating in any substance abuse services at the time of the termination hearing because he believed that doing so would likewise not be beneficial to him. Father did not begin consistently completing his required drug screens until approximately December 2022, and even then, he consistently tested positive for THC. Father testified that he did not find group counseling in jail to be beneficial to him. Nor did he participate in any other mental health counseling throughout the case. The caseworker testified that AR had been placed with her maternal grandmother for 24 of her 26 months of life and that she had an extremely strong bond with her grandmother. The caseworker further testified that the home of AR's grandmother was "the only home" that AR had ever known, and AR's grandmother was willing to adopt AR to provide her with a permanent and stable home.

Father argues that AR's relative placement weighed against termination. "[T]he fact that a child is living with relatives when the case proceeds to termination is a factor to be considered in determining whether termination is in the child's best interests," and relative placement typically weighs against termination. *Olive/Metts Minors*, 297 Mich App at 43. The trial court explicitly considered relative placement when it made its findings, and it found that while the relative placement was meeting all of the child's needs, the remaining factors, including father's substance abuse, untreated mental health concerns, and lack of compliance with and benefit from his case service plan, paired with AR's young age and need for stability and permanency, supported termination and vastly outweighed relative placement. The record evidence supports this finding,

and we are not definitely and firmly convinced that the trial court clearly erred in its findings. See *id*. at 40.

Father also argues that the trial court should have considered a guardianship in lieu of termination, that no less restrictive alternative to termination was ever considered, and that the trial court's failure to consider such alternatives violated his due-process rights. Ordinarily, "the appointment of a guardian is done in an effort to avoid termination of parental rights." *In re TK*, 306 Mich App at 705. "[F]or a court to consider a guardianship before termination, one of two conditions must be met: either the DHHS must demonstrate 'under [MCL 712A.19a(8)] that initiating the termination of parental rights to the child is clearly not in the child's best interests' or the court must 'not order the agency to initiate termination' proceedings under MCL 712A.19a(8)." *In re Rippy*, 330 Mich App 350, 359; 948 NW2d 131 (2019), quoting MCL 712A.19a(9). See also *In re COH*, 495 Mich 184, 197; 848 NW2d 107 (2014). Even then, a trial court may order a guardianship only if it "determines that [doing so] is in the child's best interests[.]" MCL 712A.19a(9)(c). In this case, neither of the conditions under MCL 712A.19a(9) was met. DHHS did not demonstrate that termination was not in AR's best interests, and the trial court ordered DHHS to initiate the termination proceedings. There is also nothing in the record to indicate that a guardianship was requested or that anyone would have agreed to such an arrangement.

Additionally, contrary to father's claims, there was some discussion regarding the possibility of alternatives to termination, including guardianship. Indeed, the trial court explicitly addressed the possibility of guardianship and had encouraged the parties "to explore alternatives to termination" very early on in this case. DHHS did so, and determined that AR's grandmother was willing to provide permanency for AR through adoption. And, as previously discussed, the trial court determined that termination was in AR's best interests. Given that both the trial court and DHHS considered permanency alternatives to termination, it necessarily follows that father's due-process rights were not violated. See *In re B and J*, 279 Mich App 12, 19-20; 756 NW2d 234 (2008) (holding that a respondent's due-process rights are violated if DHHS "deliberately takes action with the purpose of virtually assuring the creation of a ground for termination of parental rights, and then proceeds to seek termination on that very ground") (quotation marks, citations, and alterations omitted). Accordingly, father's argument that the trial court should have established a guardianship for the child in lieu of termination is without merit.

Given father's issues with substance abuse and mental health, and AR's young age and need for permanency and stability, the trial court did not clearly err by finding that it was in AR's best interests to terminate father's parental rights.

Affirmed.

/s/ Anica Letica
/s/ Stephen L. Borrello
/s/ Michelle M. Rick